UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE. NO. 21-CR-021(TSC) |
| | : | |
| | : | |
| JUSTIN TYSON, | : | |
| Defendant. | : | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing proceeding.

### I.  Background

On August 12, 2020, a member of the Federal Bureau of Investigation ("FBI")/ Metropolitan Police Department ("MPDC") Child Exploitation and Human Trafficking Task Force ("CEHTTF") was operating in an undercover capacity (the "UC") out of his office in Washington, D.C.  *See* Presentence Investigation Report ("PSR") ¶ 8.  In this capacity, the UC was posing as a 20-year-old female, with a profile on an online social media platform known to law enforcement to be a site where individuals involved in the commercial sexual exploitation of women attempt to recruit women and girls to work as prostitutes for their financial benefit.  *Id.*

While on the website, the UC observed a user with the screen name "$teel ENT Escort" and sent a wink emoji message to this user, who was later identified as the Defendant. *Id.* at ¶ 9. The Defendant's account had a publicly visible biography that read, "Helping connect people who have wants with those who have needs. It really is so simple but we as people make it complicated smh. If this is a Lifestyle your interested in hit me up the money is great and no

pimping ma...I'm more like a Mack. Know the difference!" *Id.* Below is a portion of the initial conversation that ensued between the UC and the DEFENDANT:

> DEFENDANT: Hey
> UC: What's good?
> DEFENDANT: U trying to get money
> UC: Who isn't? What u got going
> DEFENDANT: Got a pretty good escort service going pass me your number so we can speak. Can you travel?
> UC: Yes I can travel
> DEFENDANT: U should come let me host u at a few spots and get this money
> UC: Baltimore?
> DEFENDANT: Yes. Amongst other places
> UC: Oh cool. And I can get good money?
> DEFENDANT: Yes. What is ur number

*Id.*

On August 27, 2020, the UC responded to the Defendant and provided a phone number. *Id.* at ¶ 10. The Defendant then sent the UC a text message, using phone number (410) 413-3733. *Id.* The Defendant mentioned that he had a partner, whom he referred to as Starr, and he provided the UC Starr's phone number. Using a tool available to law enforcement, the UC was able to determine that phone number (410) 413-3733 and Starr's phone number were both used to post numerous sexual solicitation advertisements on the websites Megapersonals, OneBackpage, SkiptheGames, and AdultLook[1] in the Washington, D.C. and Baltimore, Maryland regions. *Id.* at ¶ 11. Below is an example of one the posted advertisements found on Megapersonals, listing phone number (410) 413-3733, which is the Defendant's phone number:

> Posted August 22, 2020 in Washington, D.C. – Header: "I'm ready…are you WAP[2] ALERT." Body: "But remember sweetie what happened here stays here🫦. I never kiss and tell but i do show and prove. Put your money where your mouth is and lets have fun like adults do. I AM A LOW VOLUME PROVIDER MY WALLS INTACT I GOT

---

[1] These websites are known to law enforcement because they are commonly used to post commercial sex advertisements.
[2] In this context, WAP means Wet Ass Pussy

THAT WAP🛑 SAFE PLAY ALERT DONT BE A 🤡ASS DUDE NOTHING WORSE THEN THAT."

*Id.*

On August 27, 2020, at approximately 5:48 p.m., a Confidential Human Source ("CHS") placed a phone call to the Defendant, pretending to be the woman the Defendant met online. *Id.* at ¶ 12. During the conversation, the CHS asked the Defendant for information about what she would be doing. *Id.* at 12. In response, the Defendant asked the young woman if she liked sex and informed her that she would have to "love sex." *Id.* The Defendant further stated that he puts people with the CHS who are looking for a "similar experience, meaning they have needs and wants they want taken care and you have some needs and wants from them. You want to be financially compensated for your time." *Id.* The Defendant so said, "We are not selling sex. We are not offering sexual favors. We are not doing none of that. These people are simply paying you for your time. What happens between consenting adults is what happens. You are not going to be made to do anything you don't want to do." *Id.*

The Defendant asked the young woman to send him some pictures, including "nudes." *Id.* at ¶ 13. The Defendant explained that he would circulate the pictures through his "network," via email, and he asked the young woman when she would be available. *Id.* The CHS responded that she first wanted to get the information, think about it, and then get back to him. *Id.* The Defendant stated that whenever she was ready, he had a location where she was "going to kill at. It's going to be crazy. It's going to be so crazy, it's going to be stupid." *Id.* The Defendant explained that they would travel around to hotels in different states, including Maryland, Washington, D.C., Pennsylvania, and Virginia. *Id.*

During the course of these conversations, the young woman told the Defendant that she understood that whatever happens with the clients would be up to her, but she wanted to know that "if she was down for sex or blowjob, do the guys wear condoms?" *Id.* at ¶ 14. The Defendant responded that safety is important and that "we about having a family and getting this money. We like to see people prosper." *Id.* The Defendant later stated that "mother fuckers, like pimps, take all the money." *Id.* The young woman then asked the Defendant if there was a percentage of the money that she earned engaging in commercial sex work that she would be able to keep. *Id.* The Defendant stated that they would split everything 50/50 and said, "we in this together." *Id.* When asked about the various pricing, inquiring if it was "an hourly thing" and if she would be paid more if she wants sex or anal, the Defendant stated, "exactly we charge more for all of that." *Id.* The Defendant continued to explain that, "when we give a price, that is just basic price to get them in the door." *Id.* The Defendant explained that a "short stay"[3] would cost a customer $100, while an hour would cost $200, but he stated that "just to get them in the door and anything extra would be more money." *Id.*

The Defendant informed the young woman that she would stay in various hotels. *Id.* at ¶ 15. He also informed her that, even though he had other girls working for him, she probably would not see them that much. *Id.* The Defendant said that the young woman would mostly be dealing with him and his partner, Starr. *Id.* He told her that he would handle the phone calls with the clients for the CHS, and that she would not have to deal with arranging the commercial sex dates. *Id.* The Defendant also informed the young woman that there were clients that would pay $1000 to $1500 for overnight visits. *Id.*

---

[3] A short stay is known to law enforcement as a term used in commercial sex to describe 15-20 minutes of time.

The young woman asked the Defendant what would happen if she were to get caught by law enforcement while engaging in commercial sex. *Id.* at ¶16. The Defendant admitted that there is a chance of getting caught by police, but he said that he would train her about what to do so that she would not get caught. *Id.* The Defendant explained, for example, that if she answered the door naked, the police would not be able to apprehend her. *Id.* The Defendant bragged that he had been doing this for 20 years, and that no one that he has worked with ever got caught by the police. *Id.* The Defendant stated that many girls come to them (referring to himself and his partner, Starr) because they have been caught in the past, but the Defendant assured the young woman that he and his partner could provide her with security. *Id.*

On September 2, 2020, the Defendant agreed to drive from Baltimore, Maryland to Washington, D.C., to meet the UC, who he believed to be a twenty-year-old woman, so that she could begin working as a prostitute for him. *Id.* at ¶ 17. The UC and the Defendant exchanged the following text messages on that date:

> UC: I just gotta do this one last thing with her on Wednesday morning b4 I can up and leave
> UC: U feel me
> DEFENDANT: Yes ma it's all good
> DEFENDANT: I can't pick u up til afternoon but it's all love
> UC: Ya that cool
> DEFENDANT: Yayyyyyyy
> UC: U work everyday?
> DEFENDANT: Mon thru Friday 9 to 5 weekends are ours
> UC: Gotcha. Ur work fun?
> DEFENDANT: While I'm working which is typical slow escort hours u can be sleeping watching tv getting high ehatever I will still be sending clients to u ur money never stops
> DEFENDANT: U will have contact of my partner also to help
> DEFENDANT: So 24/7 care and security support
> UC: Does she work too
> UC: ?
> DEFENDANT: No
> DEFENDANT: This is Ms. Starr
> DEFENDANT: Can u talk

> UC: To her?
> UC: Would she be coming when u come get me?
> DEFENDANT: Yes we are riding together
> DEFENDANT: Is it ok?
> UC: Ya that's fine
> DEFENDANT: Cool
> UC: After u pick me up, where will be going ?
> DEFENDANT: Laurel Rosedale or pikesville
> UC: Is that where I'll be working?
> DEFENDANT: Yes
> DEFENDANT: We may go up York pa

*Id.*

On September 2, 2020, the UC sent a test message to the Defendant, asking, "U still comin today?" *Id.* at ¶ 18. The Defendant replied, "Yep if it's good with u?" *Id.* Below is a portion of the subsequent text messages exchanged between the UC and the Defendant:

> DEFENDANT: How u feeling?
> DEFENDANT: Plan is getting off work shoot down to u hit a few plays coming back to get some dollars in ur pocket and figure out where to settle in I'm getting hits for u everywhere
> UC: I'm feel good. Anything special I should bring?
> DEFENDANT: Just ur clothes for a couple days not sure how long u intend to stay but u r welcome to bring what u like
> DEFENDANT: Ask away any questions u may have
> DEFENDANT: I'm going to send u possible location address sometimes during the day
> UC: Ok. I'm gettin excited
> DEFENDANT: Lol
> DEFENDANT: Me too
> UC: Can't talk on phone right now. What's up?[4]
> DEFENDANT: Needed to rap a bit will catch u later I can't talk now or please call my partner I'm giving her itinerary now 4109002766 Starr
> DEFENDANT: She knows everything and can speak for me
> UC: Ok. I will call her

*Id.*

---

[4] The Defendant was the individual who placed this call to the UC.

On September 2, 2020, at approximately 4:26 pm, the CHS called Starr, who initially acted like she did not know the Defendant. *Id.* at ¶ 19. However, as the conversation continued, Starr informed the young woman that she and the Defendant make money together. *Id.* During the course of this conversation, Starr told the CHS that the money she made engaging in commercial sex would be split 50/50 between them (meaning Starr and the Defendant) and the CHS. *Id.* When asked whether or not the Johns would wear condoms, Starr replied, "If condoms are not used, that's extra." *Id.* Starr also told the young woman that she had been working with the Defendant for 10 years. *Id.* at ¶ 20.

Eventually, it was agreed that the Defendant would come and pick up the twenty-year-old woman at an agreed upon location in Washington, D.C. *Id.* at ¶ 21. While this initial meeting fell through, the Defendant offered to purchase a ticket for the young woman to travel from Washington, D.C. to Baltimore, Maryland to meet him. *Id.* at ¶21. On September 3, 2020, the Defendant engaged in a lengthy text communication, in an effort to persuade the young woman to come up to Maryland and work as a prostitute for him. *Id.* at ¶ 22.

> DEFENDANT: Leave again
> DEFENDANT: Baby the world is urs let's take it together
> UC: I really don't want to come back and have to deal with her
> UC: Once I'm gone I'm gone
> DEFENDANT: Come
> DEFENDANT: No need to bs around
>
> DEFENDANT: If ur not happy we need to get u where u can be happy
> UC: I'm not bsing
> UC: U could have had last night
> DEFENDANT: I know ur not
> UC: I just ain't looking for unnecessary drama with my aunt
> DEFENDANT: I'm not saying u r I'm just saying come let's get this started
> DEFENDANT: It's the first of the month
> DEFENDANT: It's the weekend
> DEFENDANT: And dicks will be hard from here to Toledo
> DEFENDANT: Let's get the money
> UC: I think they will still be hard ton Tuesday lol

>DEFENDANT: No drama I been in ur shoes
>UC: U don't know my aunt
>DEFENDANT: Lol yes they will be
>DEFENDANT: Ur right
>DEFENDANT: I don't
>DEFENDANT: But I know it's best to strike while the weekend warriors got bread
>UC: It's just easier this way and that way so can be all in when I come
>DEFENDANT: Ok
>DEFENDANT: No stress
>DEFENDANT: I'm here getting ticket now
>DEFENDANT: Just making sure u sure
>UC: I'm sure. I know its a wait but it will make me feel better
>DEFENDANT: Did u get information
>DEFENDANT: Ur trip is confirmed

*Id.*

On September 3, 2020, the Defendant purchased a Greyhound bus ticket from Union Station in Washington, D.C. to Baltimore Downtown Bus Station scheduled to depart on September 8, 2020 at 4:50 p.m. and arriving in Baltimore Maryland at 6:15 p.m. *Id.* at ¶ 23. The bus ticket was purchased by a Visa credit card in the Defendant's name, and the CHS's purported name was listed as the ticketed passenger. *Id.* On September 9, 2020, when the Defendant arrived at the bus station in Baltimore, rather than meeting the twenty-year-old woman he was expecting, the Defendant was met by law enforcement. *Id.* at 26. The Defendant was arrested and transported to the District of Columbia. *Id.* At the time of his arrest, the Defendant had two cellular telephones. *Id.*

A review of the cell phones shows that this Defendant recruited numerous young women using the same website where law enforcement initially found him. *Id.* at ¶24. The Defendant's scheme appears to be that he engages in a series of text exchanges with the young women, where he offers to create "profiles" for them; find "dates" for them; and take a portion of the money they earn. *Id.* Below is a portion of a text exchange between the Defendant and a young woman, referred to as Individual A, on June 11, 2020.

> Defendant:  Have you ever escorted?
> Individual A:  Yes
> Defendant:  We could get money what are your dos and don'ts
> Individual A:  Not looking for a pimp
> Defendant:  No a pimp ma pimps take ur money we break bread

*Id.* As this text exchange continued, the Defendant and Individual A discussed how she would see Johns, what types of sexual activity she would engage in, and what was necessary to create a profile in order to advertise the young woman for commercial sex. *Id.*

On January 21, 2021, the Defendant was charge by Information with Coercion and Enticement, in violation of Title 18 U.S. C. § 2422(a). *Id.* at ¶ 1. The Defendant pled guilty, pursuant to a Plea Agreement, on February 26, 2021. This Court adjourned the matter for Sentencing on May 21, 2021. *Id.* at 3.

## II.     A Sentence of 21 Months Accurately Reflects the 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[5] These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the Defendant;
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the Defendant; and
>     (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
> (3) the kinds of sentences available;
> (4) the applicable sentencing guidelines range for the offense;
> (5) pertinent policy statements issued by the U.S. Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct; and

---

[5] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point.


(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A. The Nature and Circumstances of the Offense

A sentence at the top of the Guidelines range is appropriate in this case because the offense of conviction is a crime of violence which typically involves individuals, like the Defendant, targeting young, vulnerable, women for the purpose of sexually exploiting them for their own financial gain. It would be a mistake to view the Defendant's actions as a "victimless crime" because, in this one isolated incident, he was communicating with law enforcement acting in an undercover capacity. Rather than a one-time, isolated incident, the evidence shows that this Defendant has been sexually exploiting numerous women for his own financial gain for years. Based on the chats the Defendant engage in with the UC, and the admission of his "business" partner, he has been offering women up for commercial sex for well over a decade.

As detailed above, law enforcement first encountered the Defendant on a social media platform in August of 2020. This social media platform has been around for over fifteen years, claims to have over 300 million members, and is marketed as an easy way to meet and socialize with new people through games and shared interests.[6] This social media platform was specifically chosen because it is known to law enforcement to be a site that individuals, like the Defendant, who engage in the commercial sexual exploitation of women, post profiles

---

[6] This explanation is taken from the website associated with this social media platform. The name of this website is being withheld in public filings to protect the integrity of ongoing investigations.

advertising and glamorizing their criminal lifestyles, and seek out women to work for them in the dangerous world of prostitution.

A review of the Defendant's publicly available profile on this website shows that he is proud of his criminal lifestyle, and that he spends a considerable amount of time glamorizing the work that he does in an effort to recruit women to work for him.  A copy of the Defendant's profile is attached to the Government's Sentencing Memorandum as Exhibit 1.  The Defendant's chosen username, "$teel ENT Escort," leaves little doubt as to his reason for using this social media website.  *See* Exhibit 1.  Additionally, his "biography" further emphasizes that he is using this website as a way to illegally advertise commercial sex:  "Helping connect people who have wants with those who have needs. It really is so simple but we as people make it complicated smh. If this is a Lifestyle your interested in hit me up the money is great and no pimping ma...I'm more like a Mack. Know the difference!" *Id.* at page 2.  He publicly advertises a life filled with marijuana, alcohol, scantily clad women, and hotel rooms. *See* Exhibit 1.  Rather than attempting to hide his illegal conduct, he posted a text exchange showing his attempts to set up a commercial sex "date". *Id.* at page 9.  Even more disturbingly, there is a photograph of the Defendant, a convicted felon who should not have access to firearms, holding a shotgun, carrying numerous shells, and wearing what appears to be a handgun on his hip.[7]  *Id.* at page 30.

What is even more disturbing is that, at least on one prior occasion in connection with his commercial sexual exploitation of women, there are allegations that the Defendant has been violent, and that the women he has recruited are not only being commercially and sexually exploited, but that they are doing so out of fear and against their will.  In December of 2018, Anne

---

[7] As discussed more fully below, the Defendant has a felony conviction for the Manufacture and Distribution of Narcotics.   As such, it is unlawful for him to possess firearms and ammunition.  *See* 18 U.S.C. §922(g)(1).

Arundel County Police Officers responded to the report of an assault at a hotel. A redacted copy of the police report documenting this incident is attached to the Government's Sentencing Memorandum as Government's Exhibit 2. Upon arriving at the hotel, officers spoke to a woman who said that the Defendant assaulted her. *See* Government's Exhibit 2 at page 2. According to the victim, she had tried to enter one of the hotel rooms to speak to her friend, Star. *Id.* at page 3. The Defendant did not allow her into the room, pushing her and striking her with a closed fist. *Id.* During the course of the conversation with law enforcement, the reporting victim told the officers that she had met another "girl" who told her that the Defendant had taken her money from her and brought her to the hotel. *Id.* The officers were able to locate this woman and speak to her. *Id.* When asked if she was at the hotel "of her own free will," the woman shook her head no and replied, "no, not really." *Id.* She explained how the Defendant had recruited her and how she was transported from her home to the hotel where she was discovered by law enforcement. *Id.* The woman reported that, while she was at the hotel, the Defendant arranged for several Johns to come to the hotel and engage in various sex acts with her for his financial gain. *Id.* The woman indicated that she felt unsafe, and that she had witnessed arguments between the Defendant and other women who were working with him at the hotel. *Id.* The woman informed the police officers that the Defendant had bragged that he had several women "working" for him, and that she was afraid that he knew where she lived. *Id.*

The Defendant's prior interaction with law enforcement is significant, because it underscores how the very type of offense that this Defendant has pled guilty can pose a grave danger not only to the women who are caught up in the world of commercial sex, but also to other members of the community. The world of commercial sexual exploitation is extremely dangerous. Studies have shown that women who are engaged in prostitution experience violence ranging from

slapping and punching to assaults with deadly weapons and rape. *See* Dalla, R. (2000, November). *Exposing the "pretty woman" myth: A qualitative examination of the lives of female streetwalking prostitutes*. The Journal of Sex Research, 37(4), 344-353 (In a study of prostituted women, 72.1 % reported severe abuse at the hands of pimps, male sexual buyers, or boyfriends.  The acts of abuse include being raped, beaten with objects, threatened with weapons, or abandoned in remote locations).  An investigation into the mortality rate of women in prostitution revealed that the leading cause of death was homicide and found that actively prostituting women were nearly 18 times more likely to be murdered than women of similar age and race.  *See* Potterat, J., Brewer, D., Muth, S., Rothenberg, R., Woodhouse, D., Muth, J. et al. (2004). *Mortality in a long-term open cohort of prostitute women*. American Journal of Epidemiology, 159(8), 778-785.  Furthermore, studies have also demonstrated that a high percentage of individuals who are involved in commercial sex work want to stop prostituting, but they feel that they are trapped.  *See* Farley, M. and Barkan, H. (1998). *Prostitution, violence against women, and posttraumatic stress disorder*. Women & Health, 27(3), 37-49.  This study eerily echoes what one of the victims told Anne Arundel police officers when she was interviewed inside a hotel in December of 2018.  *See* Exhibit 2 at page 3.  Like many victims working in the commercial sex work, the woman reported to law enforcement that she was not at that hotel voluntarily, and that she felt that she could not leave. *Id.*  For all of these reasons, when the nature and circumstances of the Defendant's criminal conduct is considered, it is clear that a sentence of 21 months is appropriate.

    **B. History and Characteristics of the Defendant**

    Despite the fact that this Defendant had a full-time, well-paying, legitimate job, he deliberately chose to increase his wealth through illegal acts that sexually exploit and endanger women.  *See* PSR ¶ 98. Although some of his criminal convictions are remote in time, this

Defendant does have a criminal history, which includes a conviction for Possession with Intent to Distribute, from 1998, and a conviction for Possession with Intent to Distribute a Controlled Substance, from 2002. *Id.* at ¶¶ 60-61. For the latter, he was sentenced to probation, which he violated. *Id.* at ¶ 61.

In addition to the incident reported to the Anne Arundel County Police Department in December 2018, there are other indications that the Defendant has a history of committing violent offenses. He was arrested in 2007 for Assault, but the case was not prosecuted. *Id.* at ¶ 65. The Defendant was arrested again for Assault, in 2010, but the case was eventually put on the STET document and ultimately dismissed. *Id.* at ¶ 67.

Even if the Court feels that the Defendant's felony convictions are remote in time, these convictions and the repeated contacts with law enforcement involving assaultive conduct should be taken into consideration when fashioning an appropriate sentence. Furthermore, his history of failing to comply with the terms and conditions imposed by Courts, when he has been released following his prior convictions, should give this Court great pause when considering the risk he poses upon his release.

The Defendant does not stand before the Court due to a one- time lapse in judgment nor a simple mistake. Rather, he has engaged in an ongoing course of criminal conduct that exploits women. Not only that, but he has bragged about it on social media. Nothing could be a better indicator of this Defendant's true history and character. As such, a sentence at the top of the Guidelines range is appropriate.

    C. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the Defendant is punished justly. *See United States v. Irey*,

612 F.3d 1160, 1206 (11th Cir. 2010).  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the Defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.  (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

Therefore, with respect to 18 U.S.C. § 3553(a)(2)(A), a sentence of 21 months would provide "just punishment" for the Defendant's offenses, promote respect for the law, and reflect the seriousness of his offenses.

### D. The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things.").  A sentence of incarceration is needed in order to deter the criminal conduct of others who might see fit to profit off of the sexual exploitation of young women.  As stated in *United States v. Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007).

18 U.S.C. § 3553(a)(2)(B) dictates that a sentence of 21 months is appropriate because a sentence of incarceration conveys the message that the Defendant's actions are not "victimless crimes."  As such, this Court is in the position to send a loud and clear message to those individuals, like the Defendant, who are willing to exploit others for their own financial gain.  This is a serious offense which warrants a sentence at the top of the Guidelines.

**E. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

The Defendant's ongoing course of criminal conduct created a grave danger to the women that he has sexually exploited, and to other members community. As a result of the criminal actions of the Defendant, and others like him who engage in the commercial sexual exploitation of women, residents living in the areas in which prostitution is happening often find themselves as witnesses to, and victims of, crime. Various crimes, in addition to prostitution, are committed by the women working in prostitution, the pimps who are exploiting them, and the Johns who are coming into the neighborhoods. In carrying out his criminal conduct, this Defendant acted as an "enforcer," threatening and intimidating Johns when he believed they failed to pay the agreed upon price for commercial sex. In June of 2020, the Defendant sent a series of threatening texts to a John. A copy of this text exchange is attaching to the Government's Sentencing Memorandum as Exhibit 3. The Defendant threatened to come to the John's home; cause problems for the John with his neighbors; post photos of the John on social media; and place signs in front of his home, accusing the John of being involved with underage girls. *See* Exhibit 3.

When the prostitution is occurring in hotels, as the Defendant's criminal conduct frequently did, it leads to complaints by other guests and harms the business of the hotel itself. This is due to the nature of the activity that is happening, the clientele that is entering and exiting the premises illegally, and the involvement of law enforcement. This very situation presented itself on at least one prior occasion, when a woman reported that the Defendant assaulted her inside a hotel in Maryland, causing law enforcement to respond to the hotel. *See* Exhibit 2. In that instance, the hotel made it very clear to law enforcement that the Defendant was not welcome to stay on their property. *Id.* at page 4.

The Defendant's behavior in both of these instances is especially troubling and it is indicative of the danger that he has posed, and could continue to pose, to the community upon his release. Furthermore, despite the fact that he is prohibited from owning a firearm, the Defendant shows off his access to them on social media. *See* Exhibit 2 at page 30. As this Court is well-aware, a firearm has the potential of causing meaningful bodily injury to innocent members of the community, to include death. Thus, the risk that this Defendant poses to the public is serious. For these reasons, a 21- month sentence is necessary to protect the women that this Defendant has sexually exploited, the various customers he may encounter, and the community at large.

### III. Conclusion

The Government submits that a sentence of 21 months is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Dated: May 14, 2021                         Respectfully submitted,

                                            CHANNING D. PHILLIPS
                                            ACTING UNITED STATES ATTORNEY

                                             /s/  *Amy E. Larson*
                                            Amy E. Larson, N.Y. Bar Number 4108221
                                            Assistant United States Attorney
                                            555 Fourth Street, N.W.
                                            Washington, D.C. 20530
                                            Telephone: (202) 252-7863
                                            Email: Amy.Larson2@usdoj.gov